FELICE JOHN VITI, Acting United States Attorney (#7007)
TODD C. BOUTON, Assistant United States Attorney (#17800)
SACHIKO JEPSON, Special Assistant United States Attorney (#17077)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
todd.bouton@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PLASTIC SURGERY INSTITUTE OF UTAH, INC.; MICHAEL KIRK MOORE JR.; and KRISTIN JACKSON ANDERSEN,<br><br>Defendant. | Case No. 2:23-cr-00010-HCN<br><br><br>TRIAL BRIEF<br>OF THE UNITED STATES OF AMERICA<br><br><br>Judge Howard C. Nielson, Jr. |

## Table of Contents

1.   INTRODUCTION ....................................................................................8

2.   ANTICIPATED FACTS .........................................................................10

2.1  In early 2020, in the wake of the COVID-19 pandemic, the Secretary of the Department of Health and Human Services and the President of the United States declare the pandemic to be a national public health emergency and provide funding to develop a COVID vaccine. .......................................10

2.2  By September 2020, the CDC initiates a COVID-19 vaccination program to prepare to distribute promptly vaccines to willing recipients living in the United States once a COVID vaccine was authorized for emergency use. ......................11

2.3  Between December 2020 and February 2021, the FDA authorizes recently developed Pfizer, Moderna, and Janssen COVID vaccines for emergency use. 14

2.4  The United States buys millions of COVID-19 vaccines and contracts for the printing of millions of vaccination record cards to distribute them both as needed to address the pandemic. ..............................................................14

2.5  By May 12, 2021, Dr. Moore signs a CDC COVID-19 Vaccination Program Provider Agreement and enrolls the Plastic Surgery Institute in the CDC's COVID-19 Vaccination Program. ...........................................................15

2.6  By October 15, 2021, Plastic Surgery Institute receives its first shipment of COVID-19 vaccines through the CDC COVID-19 vaccination program. ..........17

2.7   By December 8, 2021, Dr. Moore starts providing falsely completed CDC COVID-19 vaccination record cards to unvaccinated persons without vaccinating them. ................................................................................................18

2.8   Within a few weeks, Doctor Moore arranges for fraudulent vaccination card seekers to send monetary donations to a specified charitable organization before they can receive a fraudulently completed vaccination record card. ......18

2.9   By mid-February 2022, in accordance with Ms. Andersen's instructions, vaccination record card seekers start making $50 donations to the charitable organization that are earmarked with an orange fruit emoji in the subject line of the payment to signify that the donors are making the donations to obtain a fraudulent vaccination record card. ......................................................................22

2.10  In April 2022, Dr. Moore arranges for the charitable organization to use donation funds to pay Sandra Flores to distribute fraudulent vaccination record cards at the Plastic Surgery Institute. ....................................................22

2.11  In April 2022, an undercover agent obtains a vaccination record card from the Plastic Surgery Institute without receiving a vaccine, and then someone from PSI later falsely reports that the undercover agent was vaccinated. ..................24

2.12  From October 2021 to September 2022, the Plastic Surgery Institute receives 2,260 COVID-19 vaccines and vaccination record cards and distributes fraudulent CDC COVID-19 vaccination record cards to over 1,500 persons. ...26

**2.13 By November 8, 2022, Dr. Moore's employees falsely report to the Utah Statewide Immunization Information System that the Plastic Surgery Institute has administered at least 2,072 doses of COVID-19 vaccines.** ............................27

**2.14 After Dr. Moore is indicted in this case and the United States executes a search warrant at the Plastic Surgery Institute, Dr. Moore orders his office manager to throw away all the COVID-19 vaccine doses that were stored out of sight.** .......28

**3.    ANALYSIS OF THE CHARGES** ...............................................................29

**3.1  Conspiracy to Defraud the United States by obstructing the lawful government function(s) of HHS and CDC's COVID-19 vaccination program (Count 1)** ......29

**3.2  Conspiracy to Convert, Convey, Sell, and Dispose of Government Property (Count 2)** ...................................................................................................32

**3.3  Conversion, Sale, Conveyance, and Disposal of Government Property and Aiding and Abetting (Count 3)** ...............................................................35

**3.4  Destruction of Evidence (Count 4)** .............................................................36

**4.    WITNESS TESTIMONY** ............................................................................37

**4.1  United States' Witnesses for Its Case-in-Chief** ........................................38

**4.1.1  Chris Duggar – Former Public Health Specialist with Centers for Disease Control and Prevention** .........................................................................38

**4.1.2  Richard Lakin – Immunization Director at Utah Department of Health and Human Services** .......................................................................................39

**4.1.3  Gary L. Disbrow, Ph.D. – Deputy Assistant Secretary for Preparedness and Response at the Administration for Strategic Preparedness and Response (ASPR)** ................................................................................................... 39

**4.1.4  Kari Burgoyne, Former Office Manager of PSI** ................................... 40

**4.1.5  Sandra Flores, Former Employee of PSI** ........................................... 41

**4.1.6  Gopi Krishna Vijayaraghava, Foundation for Cultural Renewal, Founder** .... 42

**4.1.7  Snetu Karania, Foundation for Cultural Renewal, Founder** ................... 43

**4.1.8  Sabrina Parish, Former Employee of PSI** ......................................... 43

**4.1.9  Camille Farley, Investigator at the Utah Division of Professional Licensing** ... 44

**4.2  Defense Witnesses** ........................................................................ 45

**5.  TRIAL EXHIBITS** ........................................................................... 47

**5.1  United States' Trial Exhibits** ........................................................ 47

**5.1.1  Trial Exhibits 1-4 and 7-10 (Series): CDC COVID-19 Vaccination Program Documents.** ................................................................................ 47

**5.1.2  Trial Exhibits 5-6 (Series): Documents re: Cost of COVID Vaccines.** ......... 47

**5.1.3  Trial Exhibits 11-20: UT Department of Health and Human Services Documents Related to PSI's Enrollment in the CDC COVID-19 Vaccination Program, PSI's Receipt of Vaccines and Vaccination Record Cards, and PSI's Reporting of (Purportedly) Administering the Vaccines.** ....................... 48

**5.1.4  Trial Exhibits 21-34: Text Messages Between Kari Burgoyne and Others— Including Dr. Moore and Ms. Andersen.** ............................................ 49

5.1.5  Trial Exhibits 35-36: Burgoyne Plea Agreement and Flores Diversion Agreement. ........................................................................................49

5.1.6  Trial Exhibits 37-39: Text Messages and Emails Between Representatives of Charitable Organization Receiving $50 Directed Donations and Andersen and Others. ........................................................................................50

5.1.7  Trial Exhibits 40-43 (Series): Records Showing Prepayments of Directed Donations to Charitable Organization for Vaccination Record Cards.............50

5.1.8  Trial Exhibits 44-46: Records Regarding Communications Between Kristin Andersen and Undercover Agent Seeking to Receive CDC COVID-19 Vaccination Record Card Without Receiving the Vaccine. .................................50

5.1.9  Trial Exhibits 47-48: Documents Related to Undercover Agent's Receipt of CDC COVID-19 Vaccination Record Card from PSI. ........................................51

5.1.10     Trial Exhibit 49: Certified Documents Regarding PSI's Registration as a Utah Corporation. ...............................................................................51

5.1.11     Trial Exhibit 50: Resume of Former CDC Employee Christopher Duggar. 51

5.1.12     Defendants have waived any objections to these exhibits. ............................51

5.2  Dr. Moore's Trial Exhibits .................................................................................52

6.     PENDING PRETRIAL MOTIONS ...........................................................................57

6.1  Pending Motion in Limine No. 1: To preclude defendants from raising HHS or CDC actions or omissions other than the lawful government functions at issue (ECF 269). ........................................................................................57

**6.2  The United States' Pending Motion in Limine No. 2: To preclude defendants from raising any professed "unlawfulness" of government function(s) at issue (ECF 270).** ........................................................................57

**6.3  The United States' Pending Motion in Limine No. 3: To preclude defendants from indirectly raising a necessity defense or any variants thereof (ECF 273).** ..58

**6.4  The United States' Pending Motion to Seal Certain Exhibits and Testimony and Protect Certain Discovery (ECF 298).** ....................................................59

**7.    OTHER ANTICIPATED LEGAL ISSUES** ..........................................60

**7.4  To what extent the defendants have waived their objections to the United States' trial exhibits** ................................................................62

**8.    ANTICIPATED DEFENSES** .........................................................62

**9.    CONCLUSION** ..........................................................................63

## 1.  INTRODUCTION

*"You have to accept the rule of law, even when it's inconvenient, if you're going to be a country that [a]bides by the rule of law."*[1]

*"The guilty do things in the dark."*[2]

This case is not about whether one agrees with everything that the HHS, CDC, or any other entity, agency, or person did to address the COVID-19 pandemic. It is not about how effective or ineffective COVID-19 vaccines were. It is not about any potential side effects from a COVID vaccine. Nor is it about the wisdom, propriety, or legality of mandates during the pandemic. It is not even about why the defendants did what they did. This case is not about motive.

This case is about the rule of law and whether parties who disagree with particular laws can break them without consequence rather than pursue legal means to change those laws. More specifically, it is about whether the defendants, Dr. Moore, his neighbor Ms. Anderson, and his company the Plastic Surgery Institute (PSI), knowingly conspired to obstruct the HHS and CDC's COVID-19 vaccination program. It is about whether they did so by enrolling in the program and then secretly wasting vaccines, distributing falsely completed vaccination record cards to over 1,500 unvaccinated persons, and falsely reporting that these unvaccinated persons were vaccinated so they could masquerade as having been vaccinated without ever receiving a vaccine.

The case is about whether, during the COVID-19 pandemic, the defendants also secretly conspired to, and did in fact, convert, sell, convey and destroy COVID-19 vaccines and vaccination record cards that belonged to the United States, knowing they did not have authorization to do so.

---

[1] Attributed to Jesse Ventura—an American politician, political commentator, actor, media personality, and retired professional wrestler, who served as the 38th Governor of Minnesota.

[2] Common idiom.

The case is also about holding a medical professional (a plastic surgeon) and his coconspirators accountable for distributing fraudulent medical documentation during a pandemic.

And it is about how Dr. Moore tried to cover up his crimes by destroying evidence in this case. More specifically, after Dr. Moore was indicted, he ordered his former office manager to destroy the unused COVID-19 vaccines so that the United States could not use their existence as evidence against him in this case to show that he had not actually vaccinated anyone.

Two of the defendants' coconspirators, who were charged in this case, have accepted responsibility for participating in these crimes.[3] The three remaining defendants have all pled not guilty to the charges against them. But fairly considered, the evidence will show beyond a reasonable doubt that Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute are all guilty of the charged crimes. They are all guilty of (1) conspiring to defraud the United States by obstructing the CDC COVID-19 vaccination program; (2) of conspiring to convert, sell, convey, and dispose of United States property—in the form of COVID-19 vaccines and CDC COVID-19 vaccination record cards; and (3) of actually converting, selling, conveying, and disposing of the same vaccines and CDC vaccination record cards. Dr. Moore is also guilty of destroying evidence by ordering the destruction of the vaccines he had hidden out of sight on the third floor of PSI.

In a nutshell, the evidence will show that from about May 2021 to about November 2022, Dr. Moore, Ms. Andersen, and others engaged in a conspiracy to use the Plastic Surgery Institute as a front to distribute fraudulently completed CDC COVID-19 vaccination record cards to over 1,500 unvaccinated persons and to falsely report having administered at least 2,072 COVID vaccines to these same unvaccinated persons, without administering a single COVID vaccine.

---

[3] Sandra Flores accepted responsibility for her involvement in the underlying offenses and entered into a diversion agreement wherein she agreed to testify against her former coconspirators. Kari Burgoyne similarly pled guilty to a related misdemeanor offense and agreed to testify at trial. Ms. Flores was not involved in the destruction of evidence.

2.  **ANTICIPATED FACTS**

The timeline below graphically depicts some of the key facts that will be shown at trial:



2.1  **In early 2020, in the wake of the COVID-19 pandemic, the Secretary of the Department of Health and Human Services and the President of the United States declare the pandemic to be a national public health emergency and provide funding to develop a COVID vaccine.**

On or about January 31, 2020, the Secretary of the United States Department of Health and Human Services (HHS) declared a national public health emergency under 42 U.S.C. § 247d as a result of the spread of a novel coronavirus to and within the United States. This coronavirus was called SARS-CoV-2 and was also known as "COVID-19."

On or about March 13, 2020, as a result of the rapid spread of COVID-19 within the United States, the President of the United States also issued Proclamation 9994. This proclamation declared a national emergency beginning on March 7, 2020, in relation to the COVID-19

pandemic. As part of the response to the pandemic, the federal government provided funding to pharmaceutical and biotechnology companies capable of developing a vaccine for COVID-19.

**2.2    By September 2020, the CDC initiates a COVID-19 vaccination program to prepare to distribute promptly vaccines to willing recipients living in the United States once a COVID vaccine was authorized for emergency use.**

By September 2020, as part of the United States' response to the COVID-19 pandemic, the CDC initiated a COVID-19 vaccination program. The purpose of the COVID-19 vaccination program was to distribute and promptly make available throughout the United States the emergency-authorized COVID-19 vaccines to members of the public who wanted a vaccine.  The CDC's vaccination program also included providing CDC COVID-19 vaccination record cards to vaccinated persons. The CDC was to make both the COVID-19 vaccines and vaccination record cards available exclusively through approved vaccine distributing entities in a manner that would provide a reliable means of verifying persons' vaccination status.

Faced with the task of promptly making COVID-19 vaccines available to hundreds of millions of Americans during a global pandemic, the CDC prepared to use cooperative agreements to collaborate with relevant state, local, and territorial immunization programs to help distribute the vaccines throughout the United States. Similar agreements had been used for other vaccines.

As part of this vaccination program, and to facilitate the proper administration and general tracking of the COVID-19 vaccines, the CDC and HHS also developed rules and protocols for the entities that would administer the vaccines at locations around the United States (vaccine distributing entities). These protocols required all vaccine distributing entities that administered the COVID-19 vaccines at physical locations to provide a COVID-19 vaccination record card to each vaccine recipient after they had received their COVID-19 vaccine.

To ensure that vaccine distributing entities appropriately administered the COVID-19 vaccines and appropriately distributed COVID vaccination record cards, the CDC would require such entities to sign a CDC COVID-19 Vaccination Program Provider Agreement before they could receive COVID-19 vaccines for distribution to the public. Among other things, these CDC Provider Agreements required vaccine distributing entities to:

a. Administer COVID-19 vaccines in accordance with all requirements and recommendations of the CDC and the CDC's Advisory Committee on Immunization Practices;

b. Within 24 hours of administering a dose of COVID-19 vaccine, to record the vaccine recipient's record and to report required information to the relevant state, local, or territorial public health authority;

c. Not sell or seek reimbursement for any COVID-19 vaccine that the federal government provided to the organization without cost;

d. Administer the vaccine regardless of the vaccine recipient's ability to pay for the administration of the vaccine;

e. Conduct its COVID-19 vaccination services in compliance with the CDC's Guidance for Immunization Services During the COVID-19 Pandemic for safe delivery of vaccines;

f. Report the number of doses of COVID-19 vaccines that were unused, spoiled, expired, or wasted as required by the relevant jurisdiction;

g. Provide a completed COVID-19 vaccination record card to every COVID-19 vaccine recipient; and

h. Administer the COVID-19 vaccines in compliance with all applicable state and

territorial vaccination laws.

The CDC further developed a CDC COVID-19 vaccination record card that was modeled

after a vaccination record card that had been developed for Yellow Fever. These vaccination record

cards were intended to provide a reliable means of verifying persons' vaccination status.

The front of the CDC COVID-19 vaccination record cards looked like this:

## COVID-19 Vaccination Record Card 

Please keep this record card, which includes medical information
about the vaccines you have received.

Por favor, guarde esta tarjeta de registro, que incluye información
médica sobre las vacunas que ha recibido.

| Last Name | | | First Name | | MI |
|---|---|---|---|---|---|
| Date of birth | | | Patient number *(medical record or IIS record number)* | | |

| Vaccine | Product Name/Manufacturer Lot Number | | Date | Healthcare Professional or Clinic Site |
|---|---|---|---|---|
| 1st Dose COVID-19 | | | ___/___/___ *mm  dd  yy* | |
| 2nd Dose COVID-19 | | | ___/___/___ *mm  dd  yy* | |
| Other | | | ___/___/___ *mm  dd  yy* | |
| Other | | | ___/___/___ *mm  dd  yy* | |

(USA Tr. Ex. 7).[4]

In their upper-right-hand corner, these COVID-19 vaccination record cards were

prominently emblazoned with the logos of both the U.S. Department of Health and Human

_____

[4] The CDC COVID-19 vaccination record cards do not have a "SAMPLE" stamp printed on them.

Services and the CDC. The CDC's connection to and issuance of the cards was unmistakable. The cards contained spaces for the full name and date of birth of the card recipient. They contained spaces to note the kind and dose of each COVID-19 vaccine administered, as well as the manufacturer name and the lot number of the administered COVID-19 vaccine(s). The vaccination record cards also included spaces to note the date each COVID-19 vaccine was administered and the healthcare professional or clinic site that administered each vaccine.

### 2.3    Between December 2020 and February 2021, the FDA authorizes recently developed Pfizer, Moderna, and Janssen COVID vaccines for emergency use.

On or about December 11, 2020, the United States Food and Drug Administration (FDA) approved the Pfizer COVID-19 vaccine for emergency use. On or about December 18, 2020, the FDA also approved the Moderna COVID-19 vaccine for emergency use. Each vaccine was approved as a two-dose regimen. Then, on or about February 27, 2021, the FDA issued another emergency use authorization ("EUA") for the Janssen COVID-19 Vaccine. The Janssen COVID-19 Vaccine was manufactured by Janssen Biotech Inc., a Janssen Pharmaceutical Company of Johnson & Johnson. The Janssen COVID-19 Vaccine was approved as a single-dose regimen.

### 2.4    The United States buys millions of COVID-19 vaccines and contracts for the printing of millions of vaccination record cards to distribute them both as needed to address the pandemic.

To make the COVID-19 vaccines available to authorized persons in the United States, the government purchased millions of COVID-19 vaccine doses from Pfizer, Moderna, and Johnson & Johnson. The United States paid at least $1 per dose of each COVID-19 vaccine.[5]

Consistent with the emergency authorizations for the COVID-19 vaccines, the Centers for Disease Control and Prevention (CDC) prepared for widespread administration of the vaccines at

---

[5] The price of each vaccine dose was well above $1.

a variety of locations. The intent was to make a COVID-19 vaccine available to all authorized adults in the United States who wanted to receive a vaccine.

These vaccines were made available to the public exclusively through the United States Federal Government. There were no third-party resellers of COVID-19 vaccines, and no company or organization was allowed to import COVID-19 vaccines from another country.

The federal government determined that these COVID-19 vaccine doses were to be distributed at no cost to vaccine recipients through the providers approved by the CDC to receive and distribute the vaccine as part of the CDC COVID-19 vaccination program.

To further provide for the administration of COVID-19 vaccines, the United States also contracted with companies to print COVID-19 vaccination record cards according to certain CDC specifications. As planned, the United States required that the COVID-19 vaccination record cards include a space to record the dates of the first and (where needed) second vaccine doses (*see* Tr. Ex. 7), and that the COVID-19 vaccination record cards be distributed as part of the vaccine ancillary kits sent to each authorized provider at their enrolled vaccine distribution location.

The CDC included COVID-19 vaccination record cards and lot numbers in each COVID-19 vaccine shipment to a vaccine distributing entity.

### 2.5    By May 12, 2021, Dr. Moore signs a CDC COVID-19 Vaccination Program Provider Agreement and enrolls the Plastic Surgery Institute in the CDC's COVID-19 Vaccination Program.

By May 12, 2021, Dr. Moore signed a CDC COVID-19 Vaccination Program Provider Agreement so that he could receive COVID-19 vaccines, lot numbers, and COVID-19 vaccination record cards from the CDC at the Plastic Surgery Institute. The Plastic Surgery Institute is a Utah corporation managed and controlled by Dr. Moore that provides plastic surgery services. (Tr. Ex.

15

49) (Utah corporate records); https://plasticsurgeryinstituteutah.com/. By signing the Provider Agreement, Dr. Moore enrolled the Plastic Surgery Institute in the CDC's vaccination program.

The fact that Dr. Moore was enrolling the Plastic Surgery Institute in the CDC's vaccination program was clear from the CDC COVID-19 Vaccination Program Provider Agreement that he signed. On the top of each page, the agreement is labeled unmistakably as a "CDC COVID-19 Vaccination Program Provider Agreement." (Tr. Ex. 11 [CDC COVID-19 Vaccination Program Provider Agreement]). On the top of the first page, the agreement states prominently that "The Centers for Disease Control and Prevent (CDC) greatly appreciates your organization's (Organization) participation in *the CDC COVID-19 Vaccination Program*." (*Id.* at 1) (emphasis added). At the top of the second page of the agreement, in the very first sentence under the heading "Agreement Requirements," it states in italicized and bolded language: "***I understand this is an agreement between Organization and CDC. This program is part of a collaboration under the relevant state, local, or territorial immunization program's cooperative agreement with CDC.***" (*Id.* at 2) (underlining added for emphasis). Right underneath this first sentence, it also states in italicized and bolded language: "***To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 vaccines), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements***." (*Id.*) (underlining added for emphasis). This included all the requirements the CDC imposed as part of its COVID-19 vaccination program. (*Id.* at §§ 1-12).

Near the top of the third page, the CDC COVID-19 Vaccination Program Provider Agreement further stated in italicized and bolded language that "***Non-compliance with the terms of Agreement may result in suspension or termination from the CDC COVID-19 Vaccination Program and criminal and civil penalties under federal law, including but not limited to the***

16

*False Claims Act, 31 U.S.C. § 3729 et seq. and other related <u>federal laws</u>, 18 U.S.C. §§ 1001,*

*1035, 347, 1349*." (underlining added for emphasis). At the bottom of the same page, the agreement

noted that "the [relevant] jurisdiction's immunization program [was] required to create a unique

COVID-19 ID for the organization . . ." which was "needed for the CDC to match [the]

Organizations (Section A) with one or more Locations (Section B)." (*Id.*). The agreement's

language made it unmistakably clear that Dr. Moore was enrolling the Plastic Surgery Institute in

the CDC's COVID-19 vaccination program.[6]

### 2.6    By October 15, 2021, Plastic Surgery Institute receives its first shipment of COVID-19 vaccines through the CDC COVID-19 vaccination program.

By October 15, 2021, the Plastic Surgery Institute received its first shipment of COVID-

19 vaccines through the CDC COVID-19 vaccination program. (Tr. Ex. 15 [PSI COVID Orders]).

This shipment contained 100 doses of Janssen COVID-19 vaccines. (*Id.*). The vaccines were

shipped from Janssen to a CDC vaccine depot and then straight to the Plastic Surgery Institute.

Over the next 11 months, over 2,100 more COVID-19 vaccines would be sent to the Plastic

Surgery Institute. (*Id.*; Tr. Ex. 16 [Spreadsheet of Vaccines Shipped to PSI]; Tr. Ex. 17 [Vaccine

Transfer Form]; Tr. Ex. 18 [Spreadsheet of Vaccine Doses Shipped to PSI]; Tr. Ex. 19 [Chart

Showing Value of Doses Delivered to PSI]).

With every dose of vaccine, the CDC also shipped ancillary packets containing CDC

COVID-19 vaccination record cards and lot numbers for each dose of vaccine. (Tr. Ex. 16

[Spreadsheet of Vaccines Shipped to PSI]).

/ / /

---

[6] Defense counsel have suggested that Dr. Moore may have thought he was obstructing a Utah state immunization program independent of the CDC or any federal agency. The language of the CDC COVID-19 Vaccination Program Provider Agreement refutes this argument.

**2.7    By December 8, 2021, Dr. Moore starts providing falsely completed CDC COVID-19 vaccination record cards to unvaccinated persons without vaccinating them.**

By December 8, 2021, Dr. Moore had already provided a husband-and-wife couple with two falsely completed CDC COVID-19 vaccination record cards. Dr. Moore had been connected to them through a mutual acquaintance. On about December 8, 2021, the couple came to Dr. Moore's home and had dinner with him. While they were there, Dr. Moore personally handed them both precompleted CDC COVID-19 vaccination record cards with their names and birth dates on them, falsely purporting to show that the couple had received COVID-19 vaccines from the Plastic Surgery Institute. Dr. Moore did so knowing that neither of them had been vaccinated for COVID-19, and without administering a COVID-19 vaccine to either of them.

**2.8    Within a few weeks, Doctor Moore arranges for fraudulent vaccination card seekers to send monetary donations to a specified charitable organization before they can receive a fraudulently completed vaccination record card**.

Within a few weeks after providing fraudulently completed CDC COVID-19 vaccination record cards to the married couple in his home, Dr. Moore arranged to direct persons seeking fraudulent vaccination record cards to send monetary donations to a charitable organization founded by the couple. He used this as a screening mechanism and set up the system to create an illusion of distance between his Plastic Surgery Institute and this flow of money.

[See text message on next page]

18



(Tr. Ex. 37 [excerpted text message between Ms. Andersen and owner of charitable organization]).

More specifically, Dr. Moore used his codefendant and neighbor, Kristin Andersen, to set up an elaborate system to screen persons seeking fraudulent vaccination record cards. When someone approached the Plastic Surgery Institute to obtain a fraudulent vaccination record card, they would first be required to provide the name of a referral who had already received a CDC COVID-19 vaccination record card from the Plastic Surgery Institute without receiving a COVID-19 vaccine. If, and apparently with few or no exceptions, *only if* the referral was verified, the card seeker then would be directed to communicate with Ms. Andersen over text. Ms. Andersen would then provide the card seeker with a link to the charitable organization's website and direct them to make a $50 donation for each person and each appointment to receive a CDC COVID-19 vaccination record card with fraudulent entries suggesting that the person had been vaccinated.

Ms. Andersen also often directed fraudulent card seekers to include an orange (fruit) emoji in the subject line of the Venmo or PayPal donation payment to the charitable organization. This was to help allow the charitable organization to track which "donations" were from fraudulent vaccination record card seekers, as opposed to an honest donor. After making the required $50 donation(s), fraudulent vaccination record card seekers were instructed to send proof of payment to Ms. Andersen—usually with a screenshot of the payment made.

[See below for sample text message regarding directed donations]



[continued below]



(Tr. Ex. 23 [Texts between Burgoyne and Anderson] at PR-KB-KA-01-00001.158 to 159).

After Ms. Andersen had screened persons seeking fraudulent vaccination record cards in

this calculated, multi-step manner, she would send them forms to complete and/or immediately

approve them to make an appointment to come to the Plastic Surgery Institute. These appointments

were for them to receive fraudulently completed vaccination record cards falsely suggesting that

the Plastic Surgery Institute had actually administered COVID-19 vaccines to the card recipients.

**2.9    By mid-February 2022, in accordance with Ms. Andersen's instructions, vaccination record card seekers start making $50 donations to the charitable organization that are earmarked with an orange fruit emoji in the subject line of the payment to signify that the donors are making the donations to obtain a fraudulent vaccination record card.**

By mid-February 2022, the owners of the charitable organization to which Ms. Andersen directed card seekers to pay the $50 donations (for each false vaccination notation) began to see payments earmarked with orange (fruit) emojis. This was because many seekers of fraudulent vaccination record cards followed Ms. Andersen's instructions to include an orange (fruit) emoji in the subject line of their $50 payments for each fake dose of COVID-19 vaccine.

An account statement from the charitable organization, as well as payment records for a PayPal account and a bank account for the organization also reflect directed donation payments in increments of $50 or multiples of $50. (Tr. Exs. 40-43).

**2.10    In April 2022, Dr. Moore arranges for the charitable organization to use donation funds to pay Sandra Flores to distribute fraudulent vaccination record cards at the Plastic Surgery Institute.**

In April 2022, Dr. Moore arranged to meet with the owners of the charitable organization, with his then-office manager Kari Burgoyne, and with Sandra Flores. The purpose of the meeting was to arrange for Ms. Flores to "work" at the Plastic Surgery Institute two days per week in the afternoons. On her shifts, Ms. Flores would distribute fraudulent CDC COVID-19 vaccination record cards to persons who had been screened by Ms. Andersen and had made the required $50 donation for each fake administration of a dose of COVID-19 vaccine. Ms. Flores would also administer saline shots to minors whose parents wanted them to believe that they had actually been vaccinated, or whose parents wanted them to be able to technically claim to have been vaccinated. In turn, Ms. Flores would be paid $18 per hour from a portion of the directed $50 donations made to the charitable organization. Dr. Moore did this because he did not want the money from the donations to be traced back to him and his business.

22

Dr. Moore, the founders of the charitable organization, and Ms. Flores agreed to this arrangement. For about the next 2 months until about mid-June 2022, Ms. Flores worked about 7 hours per week distributing fraudulently completed CDC COVID-19 vaccination record cards to unvaccinated persons. The cards falsely represented that the recipients had been vaccinated by the someone at the Plastic Surgery Institute.

During these first few months about 40 patients came into PSI every week to receive fraudulent vaccination record cards. As instructed by Ms. Burgoyne, Ms. Flores would complete the fraudulent vaccination record cards and include a valid lot number for an actual COVID-19 vaccine to make the fraudulent cards appear to validate the listed vaccinations. As requested, Ms. Flores would then use a login and password for Ms. Burgoyne to falsely report to the Utah Statewide Immunization Information System (USIIS) that PSI had administered a specific COVID-19 vaccine, with a specific lot number, to the card recipient on a certain date.

Ms. Flores also administered several saline shots to minors. She had the impression that these minors believed they were receiving an actual COVID-19 vaccine, and not a saline shot.

For her work, Ms. Flores was paid a total of about $4,400 in cash taken from the required $50 donations to the charitable organization. Periodically, someone from the same organization would verify the number of hours that Ms. Flores had worked in distributing fraudulent vaccination record cards and administering saline shots to minors. They would calculate the total "wages" owed to Ms. Flores for her work. Then someone from the organization would bring Ms. Flores's salary to her in an envelope in cash. These payments were apparently not reported as wages.

**2.11    In April 2022, an undercover agent obtains a vaccination record card from the
Plastic Surgery Institute without receiving a vaccine, and then someone from
PSI later falsely reports that the undercover agent was vaccinated.**

In April 2022, an undercover agent from the Utah Department of Professional Licensing
(DOPL) obtained a CDC COVID-19 vaccination record card from PSI without receiving a
COVID-19 vaccine. The month before, this undercover agent called the Plastic Surgery Institute
to inquire about scheduling a "vaccine appointment." Ms. Burgoyne, the then-office manager,
answered the phone. She told the undercover agent that "everybody needs to go through Kris,"
meaning Kristin Andersen, and she gave the undercover agent Ms. Andersen's phone number. A
few minutes after this initial phone call, the undercover agent called Ms. Burgoyne back and asked
her, "Do I still need to contact Kris [Andersen] for the paperwork if I just want the card and not
the vaccine?" Ms. Burgoyne replied, "Yes."

The undercover agent then arranged to make an appointment to obtain a fraudulent
COVID-19 vaccination record card from the Plastic Surgery Institute in April 2022. To set up the
appointment, the undercover agent used the alias "Cami Fisher." On or about April 25, 2022, the
undercover agent went to the Plastic Surgery Institute and received a COVID-19 vaccination
record card without receiving the vaccine. In fact, she was never even offered a COVID-19 vaccine
before she was presented with the fraudulently completed card.

Below is an image of the fraudulently completed CDC COVID-19 vaccination record card
that the undercover agent received using the alias "Cami Fisher":

[see next page]

24



(Tr. Ex. 47 [CDC COVID-19 Vaccination Record Card obtained by Undercover Agent]).

A few weeks later, the undercover agent's alias ("Cami Fisher") that she used to obtain a fraudulently completed CDC COVID-19 vaccination record card from PSI was uploaded to the Utah Statewide Immunization Information System (USIIS) by someone from PSI. This was done to falsely represent to USIIS and the CDC (which had access to anonymized USIIS information) that PSI had, in fact, administered a Janssen COVID-19 vaccine to "Cami Fisher" on April 25, 2022—the day of her appointment—even though no one from PSI ever did so. The name of the reported vaccine recipient (Cami Fisher), the date of the reported vaccination (4/25/22), the location of the reported vaccination (PSI), the brand of the reported vaccine (Janssen), and the lot number for the reported vaccine (1855190) all match the information on the vaccination card.

(Tr. Ex. 12 [Redacted List of Reported Vaccines PSI Uploaded to USIIS]).

**2.12    From October 2021 to September 2022, the Plastic Surgery Institute receives 2,260 COVID-19 vaccines and vaccination record cards and distributes fraudulent CDC COVID-19 vaccination record cards to over 1,500 persons.**

From October 2021 to September 2022, Dr. Moore's Plastic Surgery Institute would receive a total of 2,260 doses of COVID-19 vaccines. (*Id.*; Tr. Ex. 16 [Spreadsheet of Vaccines Shipped to PSI]; Tr. Ex. 17 [Vaccine Transfer Form]; Tr. Ex. 18 [Spreadsheet of Vaccine Doses Shipped to PSI]; Tr. Ex. 19 [Chart Showing Value of Doses Delivered to PSI]).

With every dose of vaccine, the CDC (or its manufacturer)[7] would also ship ancillary packets containing CDC COVID-19 vaccination record cards and lot numbers for each dose of vaccine. (Tr. Ex. 16 [Spreadsheet of Vaccines Shipped to PSI]).

As indicated in the chart below, the value of these vaccines exceeded $1,000:

**Value of COVID-19 Vaccines Delivered to PSI**

(Through September 23, 2022)

| Type of COVID-19 Vaccine | Number of Vaccine Doses Delivered to PSI | Cost Per Dose of Vaccine | Value of Doses |
|---|---|---|---|
| Janssen | 1100 | $1+ | $1,100+ |
| Moderna | 200 | $1+ | $ 200+ |
| Pfizer (Adult monovalent tris) | 660 | $1+ | $ 660+ |
| Pfizer Pediatric (monovalent 5-11) | 300 | $1+ | $ 300+ |
| **Total:** | **2,260 doses** | | **$2,260+** |

(Tr. Ex. 19 [Chart re: Value of COVID-19 Vaccines Shipped to PSI]).[8]

---

[7] Janssen and Moderna COVID-19 vaccines were shipped from the manufacturer to CDC depots, and then directly to the authorized vaccine distributing entity. The Pfizer COVID-19 vaccines were shipped directly from Pfizer to the authorized vaccine distributing entity.

[8] This trial exhibit has been modified to reflect that the COVID-19 vaccines at issue cost and had a value of at least $1. The specific pricing for the doses has been omitted.

**2.13    By November 8, 2022, Dr. Moore's employees falsely report to the Utah Statewide Immunization Information System that the Plastic Surgery Institute has administered at least 2,072 doses of COVID-19 vaccines.**

Through at least November 8, 2022, Dr. Moore's employees continued to falsely report that they were administering COVID-19 vaccines to their "patients." In the CDC COVID-19 Vaccination Program Provider Agreement that Dr. Moore signed to enroll in the CDC's COVID-19 vaccination program, Dr. Moore agreed to report each administration of the vaccines to the Utah Statewide Immunization Information System. (Tr. Ex. 11 [Signed Provider Agreement] at p. 2 § 2 and p. 6). As indicated in the chart below, Dr. Moore's employees reported having administered over 2,072 doses of COVID-19 vaccines to about 1,515 persons:

**Number of COVID-19 Vaccinations PSI Reported to USIIS**

**(Through November 8, 2022)**

| Type of COVID-19 Vaccine | Number of Reported Vaccine Administrations | Number of Required Doses | Number of Persons Reportedly Vaccinated (Estimated*) |
|---|---|---|---|
| Janssen | 959 | 1 | 959 |
| Moderna | 67 | 2 | 33 |
| Pfizer | 1046[9] | 2 | 523 |

**Total:**                **2,072 doses**                **1,515 persons**

(Tr. Ex. 13 [Chart Showing Number of COVID-19 Vaccinations PSI Reported to USIIS]).

In reality, the evidence suggests that Dr. Moore's Plastic Surgery Institute never administered a single one of the 2,260 COVID-19 vaccines they received to anyone.

---

[9] Two (2) of these vaccines were reported as an MMR vaccine. But the lot number related to a Pfizer dose.

**2.14    After Dr. Moore is indicted in this case and the United States executes a search
warrant at the Plastic Surgery Institute, Dr. Moore orders his office manager
to throw away all the COVID-19 vaccine doses that were stored out of sight.**

On January 11, 2023, Dr. Moore and his codefendants, the Plastic Surgery Institute, Ms.
Andersen, Ms. Burgoyne, and Ms. Flores, were indicted for three charges of (1) Conspiracy to
Defraud the United States in violation of 18 U.S.C. § 371; (2) Conspiracy to Convert, Sell, Convey,
and Dispose of Government Property in violation of 18 U.S.C. §§ 371 and 641; and (3) Conversion,
Sale, Conveyance, and Disposal of Government Property and Aiding and Abetting in violation of
18 U.S.C. §§ 641 and 2. The same day, federal agents executed search warrants at the Plastic
Surgery Institute seeking to obtain the cellphones of Dr. Moore and Ms. Burgoyne. The search
warrants did not authorize these agents to look for unused COVID-19 vaccines.

Sometime after the federal agents executed the search warrant, Dr. Moore told Ms.
Burgoyne (his then-office manager and codefendant) to get rid of unused COVID-19 vaccines that
Dr. Moore had been storing in a refrigerator on the third floor of the Plastic Surgery Institute.
These vaccines were out of sight, because patients generally never went to the third floor.

Ms. Burgoyne followed Dr. Moore's instruction to dispose of the unused COVID-19
vaccines. She gathered them into a bag and took them home and threw them away. Had the United
States known about these unused COVID-19 vaccines, the United States could have used them as
evidence against Dr. Moore and his codefendants to prove that they had not administered the
vaccines to the "patients" to whom they had distributed the fraudulent vaccination record cards.
The vaccines also could have been used to show that Dr. Moore and his codefendants falsely
reported to USIIS that they had administered 2,072 COVID-19 vaccines to their "patients."

/ / /

/ / /

/ / /

28

### 3.  ANALYSIS OF THE CHARGES

The three remaining defendants, Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute are charged in a four-count Second Superseding Indictment. Each of the three remaining defendants is charged with three counts of (1) Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371 by conspiring to obstruct a lawful government function; (2) Conspiracy to Convert, Sell, Convey, and Dispose of Government Property in violation of 18 U.S.C. §§ 371 and 641; and (3) Conversion, Sale, Conveyance, and Disposal of Government Property and Aiding and Abetting in violation of 18 U.S.C. §§ 641 and 2. Dr. Moore is also charged with a fourth count of Destruction of Evidence in violation of 18 U.S.C. § 1512(b)(2)(B).

### 3.1    Conspiracy to Defraud the United States by obstructing the lawful government function(s) of HHS and CDC's COVID-19 vaccination program (Count 1)

The charge of conspiracy to defraud the United States (Count 1) relates to the defendants' conspiracy to impede, impair, obstruct, and defeat the HHS and CDC's lawful government function of distributing and administering COVID-19 vaccines and COVID-19 vaccination record cards through approved vaccine distributing entities, and doing so in a manner that would provide a reliable means of verifying persons' vaccination status (through controlled distribution).

To establish that Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute are guilty of conspiracy to defraud the United States in this manner, the United States must prove beyond a reasonable doubt that:

First:    the defendant agreed with at least one other person to defraud the United States by deceptively impeding, impairing, obstructing, or defeating the CDC and HHS's distribution and administration of authorized COVID-19 vaccines and vaccination record cards through approved vaccine distributing entities in a manner that would provide a reliable means of verifying persons' vaccination status.[10]

---

[10] The Tenth Circuit Pattern Criminal Jury Instructions do not include a criminal pattern jury instruction for this type of violation of 18 U.S.C. § 371. However, several other Circuits and a district court in the First Circuit do.

Second:          at least one of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

Third:           the defendant knew the essential objective of the conspiracy.

Fourth:          the defendant knowingly and voluntarily participated in the conspiracy with the intent to impede, impair, obstruct, or defeat the identified lawful government function by using deceit, craft, trickery, or dishonest means.

Fifth:           there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that the defendant's actions constituted an essential and integral step toward the realization of that purpose.[11]

(*See* ECF 317, United States Proposed Jury Instruction No. 20).

Here, the evidence clearly shows that Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute itself knowingly and voluntarily participated in a conspiracy to defraud the United States by impeding, impairing, obstructing, and defeating the HHS and CDC's COVID-19 vaccination program. They conspired with each other, with former office manager Kari Burgoyne, former

---

Fifth Circuit Criminal Pattern Jury Instruction 2.15B and Tenth Circuit Pattern Crim. Jury Instruction No. 2.19 (combined); Criminal Jury Instructions for District Courts of the First Circuit (District of Maine Internet Site Edition) Pattern Crim. Jury Instruction No. 4.18371(3); Third Circuit Model Criminal Jury Instruction 6.18.371B; Sixth Circuit Criminal Pattern Jury Instruction 3.01B; Eighth Circuit Model Jury Instruction 5.06A-1; Ninth Circuit Model Criminal Jury Instruction 11.2; Eleventh Circuit Criminal Pattern Jury Instruction O13.6; *United States v. Klein*, 247 F.2d 908, 915-16 (2d Cir. 1957) (recognizing the crime of conspiring to defraud the United States by obstructing a lawful governmental function); *see United States v. Coplan*, 703 F.3d 46, 60–61 (2d Cir. 2012) (stating elements of Conspiracy to Defraud the United States by obstructing a lawful governmental function of the United States or one of its agencies, like the CDC); *United States v. Cooper*, 654 F.3d 1104, 1115 (10th Cir. 2011) (to prove conspiracy under 18 U.S.C. § 371, government must also prove interdependence element).

[11] *See* 10th Cir. Crim. Pattern Jury Instr. 2.19, Use Note ("Regarding the element of interdependence, please refer to Instruction 2.87."); *id.* instr. 2.87 ("You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that his actions constituted an essential and integral step toward the realization of that purpose."); *See also United States v. Cushing*, 10 F.4th 1055, 1074 (10th Cir. 2021) (holding that the district court did not abuse its discretion in issuing jury instructions that described the interdependence element with the exact words in 10th Cir. Crim. Pattern Jury Instruction 2.87).

employee Sandra Flores, and others—including other Plastic Surgery Institute employees and the founders of the charitable organization to which the required $50 donations were directed.

The defendants agreed to use deceit, craft, trickery, and dishonest means to obtain COVID-19 vaccines and vaccination record cards from the United States and the CDC by enrolling in the CDC COVID-19 vaccination program and pretending to agree to administer COVID-19 vaccines to persons, and to distribute vaccination record cards only to vaccinated persons, and to accurately report the administration of COVID-19 vaccines to USIIS. Defendants knew they could not obtain COVID-19 vaccines and vaccination record cards unless they enrolled in the CDC COVID-19 vaccination program. So, they enrolled in the program and signed a CDC COVID-19 Vaccination Provider Agreement. In that agreement, they falsely represented that they would administer COVID-19 vaccines and distribute COVID-19 vaccination record cards according to CDC protocols and requirements for vaccine administration, distribution of vaccination record cards, and the required reporting of vaccine administration and waste to USIIS.

After the Plastic Surgery Institute started receiving vaccines and vaccination record cards, Dr. Moore, Kristin Andersen, Ms. Burgoyne, Ms. Flores, and others then secretly screened persons who wanted fraudulent vaccination record cards and distributed the cards to them without vaccinating them so that the cardholders could masquerade as having been vaccinated.

The language of the CDC COVID-19 Vaccination Program Provider Agreement that Dr. Moore and Ms. Burgoyne signed makes unmistakably clear that the vaccines and vaccination record cards were coming from the CDC and were sent to providers like the Plastic Surgery Institute conditioned on their agreement to administer and distribute them as specified. The COVID-19 vaccination record cards also unmistakably identified that they were issued by HHS

and CDC.[12] There was no question that by seeking to undermine and frustrate the CDC's COVID-19 vaccination program, the defendants were impeding, impairing, obstructing, or defeating a function of the CDC, HHS, and the United States of America.

Nor can there be any doubt that the defendants shared the common purpose of frustrating the HHS and CDC's lawful government function of administering those vaccines and distributing vaccination record cards to only vaccinated persons in a manner that would provide a reliable means of verifying vaccination status. The primary purpose of distributing the vaccines was so that persons who wanted a vaccine could receive them. The CDC's purpose was not to let the vaccines waste away so that the related vaccination record cards could be fraudulently distributed to unvaccinated persons. Likewise, the vaccination record cards' primary purpose was to record and verify the cardholders' COVID-19 vaccination status. Fraudulently distributing vaccination record cards to unvaccinated persons without actually vaccinating them served no other purpose than to impair, impeded, obstruct, or defeat the HHS and CDC's lawful government functions.

### 3.2 Conspiracy to Convert, Convey, Sell, and Dispose of Government Property (Count 2)

The second count for Conspiracy to Convert, Sell, Convey, and Dispose of Government Property (Count 2) relates to the defendants' agreement to convert, sell, convey, and dispose of United States property in the form of COVID-19 vaccines and vaccination record cards.

To establish that Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute are guilty of this conspiracy, the United States must first prove beyond a reasonable doubt that there was a criminal conspiracy.

---

[12] There is no suggestion anywhere on the COVID-19 vaccination record cards that they were issued by the State of Utah. Nor is there any suggestion on them that they were part of a state immunization program unrelated to the CDC's COVID-19 vaccination program.

As to the existence of a criminal conspiracy the United States must prove beyond a reasonable doubt that:

*First:*  the defendant agreed with at least one other person to violate the law.

*Second:*  one of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

*Third:*  the defendant knew the essential objective of the conspiracy.

*Fourth:*  the defendant knowingly and voluntarily participated in the conspiracy.

*Fifth*:  there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that the defendant's actions constituted an essential and integral step toward the realization of that purpose.

As to the underlying crime of conversion, sale, conveyance, and disposal of government property that the defendants are charged with conspiring to commit, the United States must also prove beyond a reasonable doubt that:

*First:*  the COVID-19 vaccines and vaccination record cards belonged to the United States government. It does not matter whether the defendant knew whether the COVID-19 vaccines and vaccination record cards belonged to the United States government, only that the defendant knew they did not belong to the defendant;

*Second:*  the defendants conspired to knowingly convert the COVID-19 vaccines and vaccination record cards intending to put them to the use or gain of another OR
the defendants conspired to sell, convey, or dispose of the COVID-19 vaccines and vaccination record cards, knowing they lacked authority to do so; and

*Third:*  the value of either the COVID-19 vaccines or vaccination record cards at issue was more than $1,000.

(*See* ECF 317, United States' Proposed Jury Instruction No. 23).

33

Here, the same evidence that proves the defendants are guilty of conspiring to defraud the United States also proves beyond a reasonable doubt that they conspired to convert, sell, convey, or dispose of government property. The evidence will show that the defendants knew that the COVID-19 vaccines and vaccination record cards they received through the CDC COVID-19 vaccination program belonged to the United States (or the HHS and CDC). They also knew that the vaccines and vaccination record cards did not belong to them. As for the COVID-19 vaccines, the defendants knew they were not authorized to do anything with them other than to administer them to persons according to CDC protocols. As for the vaccination record cards, the defendants also knew that they were not authorized to convert, sell, convey, or distribute them unvaccinated persons without first vaccinating those persons and accurately noting the vaccinations on the cards. The defendants understood that they were not authorized to use the vaccines and vaccination record cards to allow unvaccinated persons to masquerade as vaccinated. That is why the defendants resorted to secrecy, screening, and vetting card seekers through directed donations.

 The value of the vaccines or vaccination record cards also exceeded $1,000. The COVID-19 vaccines at issue were valued at over $1 per dose. The defendants received about 2,260 doses of COVID-19 vaccines from the United States. Therefore, the vaccines alone were valued at over $2,200. Depending how you calculate it, the COVID-19 vaccination record cards also had a market value of $103,600 to $226,000.[13] Either way, the value of the property exceeded $1,000.

[See charts on next page]

---

[13] Because persons seeking fraudulent COVID-19 vaccination record cards were willing to pay $50 per fraudulently notated dose on each card, the cards had a market value of $50 per notation—or up to $100 if they contained 2 notations.

  Alternatively, the Plastic Surgery Institute reported administering at least 2,072 vaccinations. Assuming each of these reported vaccinations represents a $50 notation on a vaccination record card, the value of those cards was at least $103,600.

| Vaccination Record Cards Received | Market Value of Vaccination Record Cards ($50 per notation) | Total Market Value of Vaccination Record Cards |
|---|---|---|
| 2,260 | $50 (for card w/ 1 notation) | $113,000 |
| 2,260 | $100 (for card w/ 2 notations) | $226,000 |

| Reported Vaccinations | Market Value of Vaccination Record Cards | Total Market Value of Vaccination Record Cards |
|---|---|---|
| 2,072 | $50 per notation | $103,600 |

### 3.3    Conversion, Sale, Conveyance, and Disposal of Government Property and Aiding and Abetting (Count 3)

The third count for Conversion, Sale, Conveyance, and Disposal of Government Property and Aiding and Abetting (Count 3) relates to the same conversion, sale, conveyance, and disposal of the COVID-19 vaccines and vaccination record cards at issue in Count 2.

To establish that Dr. Moore, Ms. Andersen and the Plastic Surgery Institute are guilty of this charge, the United States must similarly prove beyond a reasonable doubt that:

*First:*    the COVID-19 vaccines and vaccination record cards belonged to the United States government. It does not matter whether the defendant knew whether the COVID-19 vaccines and vaccination record cards belonged to the United States government, only that the defendant knew they did not belong to the defendant;

*Second:*    the defendants knowingly converted the COVID-19 vaccines and vaccination record cards intending to put them to the use or gain of another OR
the defendants sold, conveyed, or disposed of the COVID-19 vaccines and vaccination record cards, knowing they lacked authority to do so; and

*Third:*    the value of either the COVID-19 vaccines or vaccination record cards at issue was more than $1,000.

For the same reasons that the evidence will prove Count 2, the evidence will also prove that the defendants are guilty of this count.

35

To prove that the defendants are guilty of aiding and abetting the offense of Conversion, Sale, Conveyance, and Disposal of Government Property in violation of 18 U.S.C. § 641, the United States need not show that a defendant personally committed the crime. The United States may simply prove that the defendant intentionally helped someone else commit the crime.

To prove a defendant guilty of violating 18 U.S.C. § 641 as an aider and abettor, the United States must prove each of the following beyond a reasonable doubt:

*First:*    the crime of Conversion, Sale, Conveyance, and Disposal of Government Property as outlined was committed by someone other than the defendant.

*Second:*    the defendant intentionally associated him- or herself in some way with the crime and intentionally participated in it as he or she would in something that he or she wished to bring about. This means the government must prove, that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

(*See* ECF 317, United States' Proposed Jury Instruction No. 26).

In the event that a jury were to conclude that a particular defendant did not commit the underlying crime of conversion, sale, conveyance, and disposal of government property, the evidence will show beyond a reasonable doubt that, at a minimum, the defendant aided and abetted the crimes. Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute all associated themselves with the charged crime and intentionally participated in converting, selling, conveying, and disposing of the COVID-19 vaccines and vaccination record cards at issue.

### 3.4    Destruction of Evidence (Count 4)

The last count for Destruction of Evidence is charged only as to Dr. Moore (Count 4). This charge relates to Dr. Moore's ordering Ms. Burgoyne to get rid of the unused COVID-19 vaccines after the defendants were indicted in this case, and after the United States executed search warrants on Dr. Moore and Ms. Burgoyne in relation to the case.

To find Dr. Moore guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First:*         the defendant used corrupt persuasion against Kari Burgoyne;

*Second:*    the defendant acted knowingly and with intent to cause or induce Kari Burgoyne to destroy or conceal an object; and

*Third:*      the defendant intended to impair the object's integrity or availability for use in an official proceeding.

(*See* ECF 317, United States' Proposed Jury Instruction No. 28).

Here, the evidence will show beyond a reasonable doubt that Dr. Moore is also guilty of this crime. He corruptly persuaded Ms. Burgoyne (his then-office manager and coconspirator) to destroy the unused COVID-19 vaccines. And he did so with the intent to impair the vaccines' integrity and availability for use in an official proceeding—namely, this case. Dr. Moore knew that the existence of the vaccines would tend to show that he and his codefendants had not actually administered the vaccines that they had purported to administer in both the vaccination record cards they fraudulently distributed and in their false reporting to USIIS. He clearly ordered the destruction of this evidence so that it could no be used in this case.

## 4. WITNESS TESTIMONY

In its case-in-chief, the United States plans to call nine witnesses. Their testimony will establish that the defendants knowingly participated in a conspiracy to defraud the United States by obstructing the CDC's COVID-19 vaccination program. Their testimony will also establish that the defendants knowingly conspired to, and did in fact, convert, sell, convey, and dispose of the CDC's COVID-19 vaccines and vaccination record cards. It will also establish that after Dr. Moore was indicted in this case, he unlawfully ordered the destruction of the unused COVID-19 vaccines hidden at PSI so they could not be used as evidence against him.

## 4.1    United States' Witnesses for Its Case-in-Chief

### 4.1.1    Chris Duggar – Former Public Health Specialist with Centers for Disease Control and Prevention

This is a general, but not all-inclusive, summary of Chris Duggar's expected testimony. Mr. Duggar was formerly with the CDC for over two decades. He recently retired from the CDC. His last position there was as a Senior Public Health Advisor and Division Preparedness and Response Coordinator at the CDC's Division of Healthcare Quality Promotion. During the height of the COVID-19 pandemic, from November 2020 to June 2023, he was the Director of Vaccine Distribution, Awardee, and Partnership Support for the CDC's Division of Immunization Services. In that role, he served as a member of the CDC COVID-19 Response Vaccine Task Force. Out of an abundance of caution, the United States designated Mr. Duggar as an expert witness. However, the United States believes that Mr. Duggar will be able to testify as a lay witness based on his personal knowledge of the issues that he is expected to testify about.

More specifically, Mr. Duggar is expected to testify about the CDC's COVID-19 vaccination program. He will testify about how the CDC responded to the COVID-19 pandemic with its vaccination program. He will also testify about how the United States purchased COVID-19 vaccines and controlled their distribution and the distribution of COVID-19 vaccination record cards through authorized providers. He will testify about how the CDC developed COVID-19 vaccination record cards and for what purpose. He will also testify about how the CDC used CDC COVID-19 Vaccination Program Provider agreements to ensure that vaccines and vaccination record cards were properly distributed. He will also authenticate trial exhibits related to the CDC COVID-19 vaccination program.

/ / /

/ / /

### 4.1.2    Richard Lakin – Immunization Director at Utah Department of Health and Human Services

This is a general, but not all-inclusive, summary of Mr. Lakin's expected testimony. Mr. Lakin is the Immunization Director at the Utah Department of Health and Human Services. Mr. Lakin is expected to testify regarding how the Utah Department of Health worked collaboratively with the CDC through a cooperative agreement during the COVID-19 pandemic to enroll authorized Utah providers into the CDC's COVID-19 vaccination program. He will testify that during the relevant timeframe, the vaccines were distributed directly to authorized providers like the Plastic Surgery Institute. He will also authenticate and explain trial exhibits showing: (1) the number of vaccines that were ordered by and delivered to the Plastic Surgery Institute (2,260); (2) the number of vaccines reportedly wasted or lost by the Plastic Surgery Institute (12); and (3) the number of COVID-19 vaccinations that the Plastic Surgery Institute reported to USIIS that it had purportedly administered to specific persons (2,072). He will also testify about how COVID-19 vaccines were ordered by authorized providers and will authenticate the CDC COVID-19 Vaccination Program Provider Agreement that Dr. Moore and Ms. Burgoyne signed to enroll the Plastic Surgery Institute in the CDC's COVID-19 vaccination program.

### 4.1.3    Gary L. Disbrow, Ph.D. – Deputy Assistant Secretary for Preparedness and Response at the Administration for Strategic Preparedness and Response (ASPR)

This is a general, but not all-inclusive, summary of Gary L. Disbrow, Ph.D.'s (Dr. Disbrow) expected testimony. Dr. Disbrow is the Deputy Assistant Secretary for Preparedness and Response at the Administration for Strategic Preparedness and Response (ASPR). Dr. Disbrow is expected to testify about his involvement in Operation Warp Speed and his role in approving funding for the development of emergency use COVID-19 vaccines and in approving the prices that the United States ultimately paid the manufacturers for COVID-19 vaccines. He will testify that this amount

was at least $1 per dose. He will testify that the United States took ownership of the COVID-19 vaccines before distributing them. He will testify that the COVID-19 vaccines were to be distributed at no cost to vaccine recipients. He will testify that the Moderna and Janssen COVID-19 vaccines were distributed from the manufacturers to CDC depots and then directly to authorized providers. He will also testify that the Pfizer COVID-19 vaccines were distributed directly to authorized providers.[14]

### 4.1.4    Kari Burgoyne, Former Office Manager of PSI

This is a general, but not all-inclusive, summary of Kari Burgoyne's expected testimony. Ms. Burgoyne is the former office manager of the Plastic Surgery Institute. She has pled guilty to a misdemeanor and agreed to testify for the government at trial. She is expected to testify regarding how Dr. Moore asked her to figure out how to obtain COVID-19 vaccines and vaccination record cards and that, at his direction, she helped enroll the Plastic Surgery Institute in the CDC's COVID-19 vaccination program. She will authenticate the CDC COVID-19 Vaccination Program Provider Agreement that she and Dr. Moore signed.

Ms. Burgoyne will testify regarding how, at Dr. Moore's direction, she engaged in and oversaw the distribution of over 1,500 COVID-19 vaccination records cards to unvaccinated persons at the Plastic Surgery Institute. She will testify that she trained other employees to fraudulently complete the vaccination record cards with actual, verifiable lot numbers for individual vaccines. She will testify that she and others used her username and password to falsely report to USIIS that PSI had administered about 2,072 COVID-19 vaccinations—even though she is not aware of a single person who ever received a COVID-19 vaccine from PSI. She will also

---

[14] After the Court's hearing on Dr. Moore's motion to continue the trial on June 4, 2025 (ECF 322), the United States met again with Dr. Disbrow (on June 6, 2025) to ask him questions regarding the COVID-19 vaccines related to questions that the defendants had raised about them. The memorandum of his interview was produced to defense counsel on June 12, 2025.

testify about how she and other employees administered about 125-150 saline shots to minors to trick them into thinking they were being vaccinated for COVID-19.

Ms. Burgoyne is also expected to authenticate and testify about numerous text messages between her, Dr. Moore, Ms. Anderson, and others which are relevant to the charges against the defendants. More specifically, among other things, these text messages will confirm that Dr. Moore, Ms. Andersen, and other Plastic Surgery Institute employees (1) screened seekers of fraudulent vaccination record cards for referrals; (2) directed them to make and then prove (with a screenshot) that they had made $50 donations per person per each appointment to receive a card with a falsified vaccination notation; (3) distributed over 1,500 vaccination record cards to unvaccinated persons; and (4) then falsely reported to USIIS that they had administered COVID-19 vaccines to recipients of the fraudulently completed CDC COVID-19 vaccination record cards.

### 4.1.5   Sandra Flores, Former Employee of PSI

This is a general, but not all-inclusive, summary of Sandra Flores's testimony. Ms. Flores is a single mother in her 30s. She has worked as a medical assistant and is currently pursuing a nursing degree. From about June 2020 to June 2021, she worked at the Plastic Surgery Institute as a medical assistant. She will testify that around April 2022, Ms. Flores was rehired by the Plastic Surgery Institute to work two days per week in the afternoons. This time she was hired to distribute COVID-19 vaccination record cards to unvaccinated persons and to administer saline shots to minors in the place of an actual COVID-19 vaccine. She will testify that when she was hired to do this, she first met with Dr. Moore, Ms. Burgoyne, and the owners of the charitable organization at Dr. Moore's office.  In that meeting, it was agreed that she would be paid $18 per hour for her work and that the money for her "wages" would come from the donations made to the charitable organization by persons seeking the fraudulent vaccination record cards. She will testify that after

she started working in this manner, she would report her hours to the charitable organization and

that someone from the organization would periodically pay her in cash for her work in distributing

the cards and in administering the saline shots to minors. She will testify that she performed this

work from about April 2022 through mid-June 2022, and then she started to perform more

traditional work at the Plastic Surgery Institute as a medical assistant. She will testify that from

about May 2022 to mid-June 2022, about 40 patients per week would come into PSI to pick up

COVID-19 vaccination record cards. She will testify that she never saw a single patient receive a

COVID-19 vaccine at the Plastic Surgery Institute.

### 4.1.6   Gopi Krishna Vijayaraghava, Foundation for Cultural Renewal, Founder

This is a general, but not all-inclusive, summary of Gopi Krishna Vijayaraghava's (Mr.

Vijaya) expected testimony. Mr. Vijaya has two Master's degrees in physics—one from the India

Institute of Technology, and another from the University of Houston.  He and his wife (Snetu

Karania) were born in India and are not United States citizens. They are the founders of the

charitable organization that received directed donations in $50 increments form persons seeking

to obtain a fraudulent CDC COVID-19 vaccination record card from the Plastic Surgery Institute

without receiving a vaccine.

Mr. Vijaya is expected to testify that, in December 2021, Dr. Moore personally handed him

and his wife COVID-19 vaccination record cards that falsely represented that they had both

received COVID-19 vaccinations from the Plastic Surgery Institute—even though they had not.

Mr. Vijaya will testify that that the two COVID-19 vaccination record cards contained lot numbers

for the vaccine doses, the name of the vaccine distributor, the dates of the administration for two

vaccine doses, and the PSI Plastic Surgery Institute stamp under the provider portion. He will also

testify about how shortly after he and his wife received the fraudulent vaccination record cards,

42

Dr. Moore arranged to have directed $50-increment donations sent to the charitable organization with an orange (fruit) emoji in the subject line to identify that the donations were made to allow the "donor" to receive a fraudulently completed COVID-19 vaccination record card from the Plastic Surgery Institute without actually being vaccinated for COVID-19. He will likely testify regarding text messages between him, Dr. Moore, Ms. Andersen, and others. He may also testify regarding the amount of money that the charitable organization received with orange (fruit) emoji on them, and about how he agreed to, and did in fact, divert some of those funds to pay Ms. Flores for distributing vaccination record cards at PSI.

### 4.1.7    Snetu Karania, Foundation for Cultural Renewal, Founder

This is a general, but not all-inclusive, summary of Snetu Karania's expected testimony. Prior to coming to the United States from India, Ms. Karania obtained a Bachelor's degree in chemical engineering. After coming to the United States, she obtained two Master's degrees from Stanford University in fluid mechanics and hydrology.  She is expected to testify about receiving a fraudulently completed COVID-19 vaccination record card from Dr. Moore, despite not receiving a vaccine from the Plastic Surgery Institute. She is also expected to testify that Kristen Andersen was at Dr. Moore's house on that occasion in December 2021—that Ms. Andersen explained to her that information about Ms. Karania and Mr. Vijaya's new "vaccination status" would be uploaded to the online system (the Utah Statewide Immunization Information System). She may also authenticate and address different trial exhibits establishing the payments made to her and her husband's charitable organization by fraudulent-vaccination-record-card-seekers.

### 4.1.8    Sabrina Parish, Former Employee of PSI

This is a general, but not all-inclusive, summary of Sabrina Parish's expected testimony. In October 2021, Sabrina Parish was hired to work at the Plastic Surgery Institute as the manager's

assistant. She reported directly to the then-office manager, Ms. Burgoyne. Ms. Parish is expected to testify that Ms. Burgoyne ran everything in the office at PSI and that Ms. Burgoyne's orders came straight from Dr. Moore.  Ms. Parish will testify that her job responsibilities quickly evolved and that she began to work as a receptionist and a medical assistant until she left the Plastic Surgery Institute around June 2022. She will testify that Dr. Moore set up a system where the Plastic Surgery Institute could receive COVID-19 vaccines and then offer COVID-19 vaccination record cards to patrons without vaccinating them. She will testify that Ms. Burgoyne directed her to provide vaccination record cards to persons who had been vetted through Kristin Andersen. Once a person was vetted, and they had arrived at the Plastic Surgery Institute and showed proof of payment to the "foundation," they could receive a card. She will testify that the payments were usually Venmo payments but that sometimes cash payments were made. Cash payments were made and used to fund items in the clinic. She will testify that to manage the large number of persons coming into PSI to receive fraudulent vaccination record cards, Ms. Andersen required them to complete forms and bring a physical orange with them to the appointment. The orange was a sign that the person wanted to receive a vaccination record card without being vaccinated. At one point there was a large basket full of oranges at PSI. She will testify that, to her knowledge, no one who came into PSI ever received a COVID-19 vaccine.

Ms. Parrish will also testify that at Ms. Burgoyne's instruction, she administered about 5 to 10 saline injections to minors so that they would not tell anyone they received a vaccination record card without receiving a COVID-19 vaccine.

### 4.1.9   Camille Farley, Investigator at the Utah Division of Professional Licensing

This is a general, but not all-inclusive, summary of Camille Farley's expected testimony. Ms. Farley is an Investigator with the Utah Division of Professional Licensing (DOPL). Ms. Farley

is expected to testify regarding how she went undercover to obtain a COVID-19 vaccination record card from the Plastic Surgery Institute in March and April 2022. She will testify about how she called Ms. Burgoyne at the Plastic Surgery Institute and arranged to make an appointment to receive a COVID-19 vaccination record card without receiving a vaccination. She will testify about how she made the appointment and obtained a fraudulently completed COVID-19 vaccination record card from the Plastic Surgery Institute. (Tr. Ex. 47).

### 4.2    Defense Witnesses

The defendants have no obligation to put on a defense case. (U.S. Const. amend. V). And they need not decide whether to put on a defense case until after the United States rests. However, Dr. Moore's counsel has indicated that, should he ultimately elect to put on a defense case, he may call the following witnesses:

| Number | Witness | Description |
|---|---|---|
| 1 | Jennifer Pratt | Program Specialist at Utah Department of Health and Human Services, Involved with the Utah Statewide Immunization Information System |
| 2 | Elizabeth Virivong | Elizabeth Virivong, RN - Immunization Bureau Manager at Salt Lake County Health Department, Family Health Service Division |
| 3 | Aliz Deppe | Aliz Deppe – Senior Business Analyst at Utah Statewide Immunization Information System |
| 4 | Cheryl Belnap | Former/Current PSI employee (Nurse) |
| 5 | Sydney Moore | Dr. Moore's daughter and former/current PSI employee |
| 6 | Sara Maestes | Former/Current PSI employee (Injector) |
| 7 | Erica Bauer | Former/Current PSI employee (Nurse) |
| 8 | Melanie Jeppson | Former/Current PSI employee (Nurse) |
| 9 | Mallory McBride | Former/Current PSI employee (Nurse) |

| 10 | Kaylei Birwell | Former/Current PSI employee (Medical Assistant/Scrub Tech) |
|---|---|---|
| 11 | Kimerli Rock | Former/Current PSI employee (Medical Assistant) |
| 12 | Jenny Xaykosy | Former/Current PSI employee (Medical Assistant) |
| 13 | Brooke Murray | Former PSI employee (Former Office Manager/Medical Assistant/Scrub Tech) |
| 14 | Dr. Moore*<br><br>If he elects to take the stand | Defendant – Plastic Surgeon and Owner of PSI.<br><br>Alleged to have organized, directed, and led the conspiracies to defraud the United States and to convert, sell, convey, and dispose of Government property in the form of COVID-19 vaccines and CDC vaccination record cards.<br><br>Also alleged to have destroyed unused COVID vaccines hidden out of sight at PSI after he was indicted in this case so that the United States could not use evidence of their existence to prove that he had not actually vaccinated anyone to whom he distributed fraudulent vaccination record cards. |
| 15 | Kristin Jackson Andersen*<br><br>If she elects to take the stand. | Defendant – Neighbor and friend of Dr. Moore.<br><br>Alleged to have been involved in screening fraudulent CDC COVID-19 vaccination record card seekers and requiring $50 donations before card seekers could make an appointment to obtain a card from PSI without being vaccinated. |

- **Potential Rebuttal Witnesses**

If the defense puts on a defense case, the United States may call rebuttal witnesses. But the United States does not anticipate that it's rebuttal case would take more than a day.

## 5.  TRIAL EXHIBITS

### 5.1     United States' Trial Exhibits

The United States has eleven general categories or series of exhibits.

#### 5.1.1    Trial Exhibits 1-4 and 7-10 (Series): CDC COVID-19 Vaccination Program Documents.

These exhibits comprise documentation regarding the CDC's COVID-19 vaccination program. They include a sample email from the CDC state and local agencies participating in the CDC's COVID-19 vaccination program (Tr. Ex. 1), a CDC manual or "playbook" relating to the program (Tr. Ex. 2), a sample COVID-19 Vaccination Program Provider Agreement and a sample redistributor agreement (Tr. Exs. 3-4), the image of a CDC COVID-19 vaccination record card (Tr. Ex. 7), updates to the CDC COVID-19 Vaccination Program Provider Agreements (Tr. Exs. 8-9), and a CDC COVID-19 vaccination program provider site visit reviewer guide (Tr. Ex. 10).

Among other things, these trial exhibits will show that the CDC implemented a COVID-19 vaccination program that enlisted local, state, and territorial immunization programs and agencies to work with the CDC to administer COVID-19 vaccines and vaccination record cards in a controlled manner to make the vaccines available to the public and to ensure that the vaccination record cards would provide a reliable means of verifying vaccination status.

The defendants have failed to assert any timely objections to these specific trial exhibits.

#### 5.1.2    Trial Exhibits 5-6 (Series): Documents re: Cost of COVID Vaccines.

These exhibits comprise contracts establishing the price per dose that the United States paid for Pfizer, Moderna, and Janssen COVID-19 vaccines that were distributed to the public during the pandemic (Tr. Ex. 5). Trial Exhibit 6 is a chart that summarizes this information. The United States now believes that, without relying on these documents, it can establish that the vaccines cost at least $1 per dose. Therefore, the United States may withdraw these exhibits.

The defendants have raised objections to Trial Exhibit 5 on the grounds that their admittedly heavy redactions violate the rule of completeness. The Court has ordered the United Sates to turn over unredacted versions of the contract documents. The United States is prepared to do so once an appropriate Protective Order is in place, at which point it anticipates receiving these documents unredacted from the CDC.

### 5.1.3 Trial Exhibits 11-20: UT Department of Health and Human Services Documents Related to PSI's Enrollment in the CDC COVID-19 Vaccination Program, PSI's Receipt of Vaccines and Vaccination Record Cards, and PSI's Reporting of (Purportedly) Administering the Vaccines.

Trial Exhibits 11-20 comprise three main categories of documents related to (1) the Plastic Surgery Institute's enrollment in the CDC COVID-19 Vaccination Program (Tr. Ex. 11); (2) the Plastic Surgery Institute's receipt of vaccines and vaccination record cards (Tr. Exs. 15-19); and the Plastic Surgery Institute's reporting of (purportedly) administering COVID-19 vaccines to persons at PSI (Tr. Exs. 12-14, 20). More specifically, these documents comprise the CDC COVID-19 Vaccination Program Provider Agreement signed by Dr. Moore and Ms. Burgoyne (Tr. Ex. 11), documentation showing the number of COVID-19 vaccines ordered by and delivered to the Plastic Surgery Institute (Tr. Exs. 15-19), and records of the instances in which the Plastic Surgery Institute reported administering a COVID-19 vaccine to patrons.[15]

Among other things, these exhibits will show that the defendants received about 2,260 doses of COVID-19 vaccines through the CDC COVID-19 vaccination program and reported having administered at least 2,072 doses of COVID-19 vaccines to over 1,500 persons.

The defendants failed to assert any timely objections to these specific trial exhibits.

---

[15] Trial Exhibit 20 is a wastage report showing that the Plastic Surgery Institute reported only one instance of wasting or losing what appears to be a vial of twelve COVID-19 vaccines.

### 5.1.4    Trial Exhibits 21-34: Text Messages Between Kari Burgoyne and Others— Including Dr. Moore and Ms. Andersen.

Trial Exhibits 21-34 comprise text messages between Ms. Burgoyne, Dr. Moore, Ms. Andersen, Ms. Parish, Mr. Vijaya, and others that were sent while the defendants were allegedly engaging in the charged crimes. Among other things, these trial exhibits will show that: (1) Dr. Moore, Ms. Andersen, and the Plastic Surgery Institute knowingly participated in the charged conspiracies and other crimes; (2) Dr. Moore directed his employees to provide COVID-19 vaccination record cards to patrons without administering vaccines to them; (3) Ms. Andersen screened seekers of fraudulent vaccination record cards and directed them to make $50 donations per person per appointment to receive a fraudulently completed vaccination record card; (4) the charitable organization used part of the $50-increment directed donations from seekers of fraudulent vaccination record cards to pay Ms. Flores for handing out the fraudulently completed cards to unvaccinated persons and for administering saline shots to minors.

The defendants failed to assert any timely objections to these trial exhibits.

### 5.1.5    Trial Exhibits 35-36: Burgoyne Plea Agreement and Flores Diversion Agreement.

These exhibits comprise documentation related to a plea agreement between the United States and Ms. Burgoyne (Tr. Ex. 35) and a diversion agreement between the United States and Ms. Flores (Tr. Ex. 36). The United States intends to front these documents with the jury so that the jury is aware of these agreements.[16]

Defendants have failed to assert any timely objections to these trial exhibits.

/ / /

---

[16] Notably, given concerns that the trial testimony of Mr. Vijaya, Ms. Karania, and Ms. Parrish is likely to incriminate them, the United States is currently considering entering into immunity agreements with them. If any such agreements are entered, the United States will promptly turn them over to defense counsel and would likely introduce them as exhibits at trial.

### 5.1.6    Trial Exhibits 37-39: Text Messages and Emails Between Representatives of Charitable Organization Receiving $50 Directed Donations and Andersen and Others.

Trial Exhibits 37-39 comprise text messages between Mr. Vijaya and Ms. Andersen (and others) (Tr. Ex. 37), as wells as emails between Mr. Vijaya and Ms. Andersen (Tr. Exs. 38-39). Among other things, these exhibits will show that Mr. Vijaya and his wife agreed, at Dr. Moore's urging, to set up a system to receive directed donations in increments of $50 to help screen seekers of fraudulent COVID-19 vaccination record cards.

The defendants have failed to raise timely objections to these trial exhibits.

### 5.1.7    Trial Exhibits 40-43 (Series): Records Showing Prepayments of Directed Donations to Charitable Organization for Vaccination Record Cards.

Trial Exhibits 40-43 comprise records showing payments of directed donations to the charitable organization in exchange for obtaining fraudulent vaccination record cards. These exhibits will show that a significant number of such payments were made.

The defendants failed to assert any timely objections to these trial exhibits.

### 5.1.8    Trial Exhibits 44-46: Records Regarding Communications Between Kristin Andersen and Undercover Agent Seeking to Receive CDC COVID-19 Vaccination Record Card Without Receiving the Vaccine.

Trial Exhibits 44-46 comprise records establishing Ms. Andersen's phone number (Tr. Ex. 44), records establishing communications between Ms. Andersen and someone acting on behalf of the undercover agent (Tr. Ex. 46), and a recorded phone call between Ms. Burgoyne and the undercover agent (Tr. Ex. 45). Among other things, these exhibits will show that the undercover agent—Ms. Farley—set up an appointment to obtain a fraudulently completed COVID-19 vaccination record card from the Plastic Surgery Institute.

The defendants have failed to assert timely objections to these trial exhibits.

### 5.1.9   Trial Exhibits 47-48: Documents Related to Undercover Agent's Receipt of CDC COVID-19 Vaccination Record Card from PSI.

Trial Exhibits 47-48 comprise a fraudulently completed COVID-19 vaccination record card that undercover agent Farley obtained from the Plastic Surgery Institute on April 25, 2022 without receiving a vaccine (Tr. Ex. 47) and a QR code that undercover agent Fairly received from the Plastic Surgery Institute on the same day inviting her to leave a review for PSI on its social media account (Tr. Ex. 48). These trial exhibits will show that, on April 25, 2022, undercover agent Farley did in fact receive a fraudulently completed vaccination record card from the Plastic Surgery Institute.

The defendants have failed to assert timely objections to these trial exhibits.

### 5.1.10   Trial Exhibit 49: Certified Documents Regarding PSI's Registration as a Utah Corporation.

Trial Exhibit 49 comprises certified corporate filings from the Utah Department of Commerce regarding the Plastic Surgery Institute's registration as a Utah corporation and other corporate filings. These documents will show that the Plastic Surgery Institute is in fact a Utah corporation and that it is directed and controlled by Dr. Moore.

The defendants have failed to assert timely objections to these trial exhibits.

### 5.1.11   Trial Exhibit 50: Resume of Former CDC Employee Christopher Duggar.

Trial Exhibit 50 comprises Mr. Duggar's resume. The United States may use this resume during the direct testimony of Mr. Duggar.

The defendants have failed to assert timely objections to these trial exhibits.

### 5.1.12   Defendants have waived any objections to these exhibits.

Except for objections under Rule 402 and 403, the trial order makes clear that unless the defendants can show good cause for failing to raise objections to the United States' trial exhibits by the (now expired) May 28 deadline, their objections are deemed "waived." (ECF 288 at E.2).

Defendants Plastic Surgery Institute and Kristin Andersen never objected to the United States' exhibits. Dr. Moore indicated that he "reserves his right to challenge the authenticity of any of the government exhibits WITH THE EXCEPTION of Exhibits 42, 43 and 49." (ECF 312 at 2). Dr. Moore, however, failed to explain on what basis he objected to the authenticity of any particular exhibit. Therefore, with one exception, the United States contends that all the defendants have waived any objections to the United States' trial exhibits.

The defendants have arguably preserved their objections to the United States' Trial Exhibit 5 relating to contract documents regarding the prices the United States paid for COVID-19 vaccines. This issue was raised in their motion to continue the trial and discussed at length in the hearing at which the Court ultimately denied the motion to continue. (*See* ECF 301, 318, 322).

### 5.2    Dr. Moore's Trial Exhibits[17]

Dr. Moore's counsel has indicated that he intends to introduce 28 trial exhibits that fall within 7 general categories (DM Exhibits 1001 to 1028). All but 4 of these 28 proposed exhibits are entirely inadmissible on hearsay and authenticity grounds.

### 5.2.1    DM Exhibits 1001 to 1014: Emails from covidvaxprodiver@utah.gov

These exhibits appear to be purported emails from someone within the Utah Immunization Program, COVID Vaccination Response team that was working with the CDC's COVID-19 vaccination program. The emails purport to be mass emails sent to persons who had joined an "hl-COVIDVax" Google Group. The sender appears to have the email address "covidvaxprovider@utah.gov".

/ / /

---

[17] Defendants Plastic Surgery Institute and Kristin Andersen failed to identify or exchange any trial exhibits by the deadline imposed by the Court's Trial Order. (ECF 288 at E.1. and E.5.). Therefore, they have waived their right to present any trial exhibits.

These exhibits all appear to be inadmissible both as lacking Authenticity under Fed. R. Evid. 901(a) and as Hearsay under Fed. R. Evid. 801-802.

Dr. Moore's witness list does not appear to include anyone who could authenticate these exhibits. There is no witness listed who purportedly sent these emails. Dr. Moore could theoretically have received or seen these emails. But he did not list himself as a witness on his witness list, and there is currently no information to suggest he plans to admit these exhibits through his own testimony. Therefore, unless Dr. Moore intends to call the owner of email account covidvaxprovider@utah.gov, who authored exhibits 1001 through 1014, Dr. Moore appears to have no one to authenticate these emails. Fed. R. Evid. 901(a).

Furthermore, these exhibits should also be precluded because they comprise inadmissible hearsay—or more precisely, out-of-court statements offered for the truth of the matter asserted. Fed. R. Evid. 801-802. Dr. Moore might seek to admit these exhibits as evidence, not for the truth of the matter asserted, but merely for their "effect on the listener"—i.e., Dr. Moore may seek to use these emails to suggest that he thought he was dealing with the State of Utah as opposed to the CDC or another federal agency. But Dr. Moore should not be allowed to do so unless he can first establish that he actually received these emails and read them *before* he entered the conspiracy to obstruct and defraud the HHS and CDC government program at issue. This will not be possible for a few reasons. First, if Dr. Moore does not testify, he will have no way to show he received the emails and reviewed the emails. Second, and even more important, the earliest email in this series is from November 2021, almost six months *after* Dr. Moore signed the CDC COVID-19 Vaccination Program Provider Agreement and began to defraud and obstruct the CDC COVID-19 Vaccination Program. Thus, because this correspondence had no effect on the listener, the hearsay rule would also block its admission into evidence.

Notably, Dr. Moore failed to respond to the United States' objections to these exhibits by the deadline set in the Court's Trial Order. (ECF 288 at E.3. (setting June 5 deadline to respond to objections raised by the United States); ECF 313). Therefore, the defendants should be precluded from introducing these exhibits at trial.

### 5.2.2    DM Exhibit 1015 – Kari Burgoyne Documentation Re: PSI's Enrollment in the CDC COVID-19 Vaccination Program
*(At Least Partially Admissible\*)*

DM Exhibit 1015 appears to include the CDC COVID-19 Vaccination Program Provider Agreement that Ms. Burgoyne and Dr. Moore signed to enroll the Plastic Surgery Institute in the CDC COVID-19 Vaccination Program. It also appears to include other documentation related to the enrollment in the CDC COVID-19 Vaccination Program. Ms. Burgoyne will be testifying on behalf of the United States. Therefore, Ms. Burgoyne should be able to authenticate at least some of these documents. For example, she should be able to authenticate the CDC COVID-19 Vaccination Program Provider Agreement and any other documentation that she submitted when she enrolled the Plastic Surgery Institute in the program at Dr. Moore's direction.

### 5.2.3    DM    Exhibit    1017    –    Email    from    Kari    Burgoyne    to CovidVaxInquiry@utah.gov
*(Potentially Admissible\*)*

DM Exhibit 1017 purports to be an email from Kari Burgoyne to the email address "CovidVaxInquiry@utah.gov" inquiring about how Plastic Surgery Institute could do to obtain COVID vaccines to administer to their staff. Because the United States intends to call Ms. Burgoyne to testify at trial, Ms. Burgoyne might be able to authenticate this email.

### 5.2.4    DM Exhibit 1018: Email Chain Between Rich Lakin and OIG HHS Special Agent Ashley Collins
*(Partially Admissible\*)*

DM Exhibit 1018 purports to be an email chain between Rich Lakin from the Utah Department of Health and Human Services and Special Agent Ashley Collins from the OIG for

HHS. Agent Collins is the lead agent for this case. But the United States will not call her as a witness in this case. Rich Lakin is anticipated to testify for the United States. Therefore, his statements in this email chain may be admissible. But because Agent Collins will not be testifying, her statements are inadmissible hearsay. Fed. R. Evid. 801-802. Therefore, if Dr. Moore intends to introduce this exhibit at trial, he would first need to redact the statements from Agent Collins.

### 5.2.5 DM Exhibits 1019-1020: Purported Charts from Moderna re: Moderna's Company History and mRNA Vaccine US Supply Chain Map

DM Exhibits 1019-1020 purport to be charts related to Moderna's company history relating to mRNA applications and an mRNA vaccine supply chain map for distribution in the United States. Whatever their potential relevance, if any, the proposed charts qualify as hearsay and cannot be authenticated. Dr. Moore has not identified a witness who will testify to the content of these charts or the authenticity of these charts. Additionally, Dr. Moore has not provided any voluminous records that would form the basis to support the information in the charts. Nor has he provided a business records notice or a certificate of authenticity from Moderna or any other source of these documents. Therefore, the charts are inadmissible.

Again, Dr. Moore has notably failed to respond to these objections.

### 5.2.6 DM Exhibits 1021: Purported Continuing Medical Education Certificates for Dr. Moore Related to the CDC COVID-19 Vaccination Program *(Possibly Admissible\*)*

DM Exhibit 1021 purports to comprise Certificates of Continuing Medical Education for Dr. Moore, which the United States presumes are ostensibly related to the Plastic Surgery Institute's enrollment in the CDC COVID-19 Vaccination Program. Ms. Burgoyne stated in an interview that she completed some kind of similar training for Dr. Moore in order to obtain COVID vaccines (which came with vaccination record cards). (October 31, 2024 Interview of Ms. Burgoyne). Therefore, Ms. Burgoyne may be able to authenticate this exhibit.

### 5.2.7    DM Exhibit 1022-1024: Emails from Three Persons Identified on Dr. Moore's Witness List
*(Potentially Admissible\*)*

DM Exhibits 1022-1024 purport to be emails from three persons whom Dr. Moore identified on his witness list: Jennifer Pratt, Elizabeth Virivong, and Aliz Deppe. If Dr. Moore calls these witnesses at trial, these exhibits may be admissible.

The United States notes, however, that all these emails occurred after Dr. Moore entered into the conspiracies at issue in this case. Therefore, they would not be relevant to any argument that Dr. Moore somehow did not know he was obstructing the CDC COVID-19 Vaccination Program when he acted as charged in the indictment.

### 5.2.8    DM Exhibit 1016, 1025-1028: Emails from Various Parties Not Identified on Dr. Moore's Witness List

DM Exhibits 1016, and 1025-1028 purport to be emails from various parties or organizations which are not identified as connected to any of the witnesses that Dr. Moore has identified on his witness list. Therefore, these emails appear to be inadmissible as lacking authenticity and as hearsay. Fed. R. Evid. 901(a) and 801-802. Unless Dr. Moore intends to identify and call the owner(s) of the email accounts that authored these emails, they appear to be inadmissible as unauthenticated documents containing out-of-court statements that would be offered for the truth of the matters asserted therein. Moreover, all these emails occurred six months after Dr. Moore entered into the conspiracies at issue in this case. Therefore, they would not be relevant to any argument that Dr. Moore somehow did not know he was obstructing the CDC COVID-19 Vaccination Program when he acted as charged in the indictment.

Moreover, Dr. Moore failed to respond to the United States' objections to these exhibits.

/ / /

/ / /

6.  **PENDING PRETRIAL MOTIONS**

There are four substantive pretrial motions pending before the Court:

1. The United States' Motion in Limine No. 1: To preclude defendants from raising HHS or CDC actions or omissions other than the lawful government functions at issue (ECF 269);

2. The United States' Motion in Limine No. 2: To preclude defendants from raising any professed "unlawfulness" of government function(s) at issue (ECF 270);

3. The United States' Motion in Limine No. 3: To preclude defendants from indirectly raising a necessity defense or any variants thereof (ECF 273); and

4. The United States' Motion to Seal Certain Exhibits and Testimony and Protect Certain Discovery (ECF 298).

**6.1    Pending Motion in Limine No. 1: To preclude defendants from raising HHS or CDC actions or omissions other than the lawful government functions at issue (ECF 269).**

This motion in limine seeks to preclude the defendants from raising HHS or CDC actions or omissions other than the lawful government functions at issue. This would prevent the defendants from delving into areas that are irrelevant to the case at hand—such as things that the CDC did or did not do during the pandemic that are unrelated to the charges against the defendants.

The court's ruling on this motion in limine will be important because it may significantly narrow the scope of the issues for trial and prevent the introduction of unfairly prejudicial material. To prepare their witnesses for trial, the parties will need to understand the scope of any order precluding the introduction of such evidence or argument.

**6.2    The United States' Pending Motion in Limine No. 2: To preclude defendants from raising any professed "unlawfulness" of government function(s) at issue (ECF 270).**

This motion in limine seeks to preclude the defendants from raising any professed "unlawfulness" of the government function(s) at issue in this trial. As noted in the motion, the

Court has already ruled and found as a matter of law that the Centers for Disease Control and Prevention (CDC)'s program for (1) distributing the COVID vaccine, (2) documenting who had received the vaccine, and (3) implementing the program through voluntary CDC COVID-19 Vaccination Provider Agreements was a lawful government function.[18] Therefore, the defendants should not be permitted to suggest to the jury that they should consider the lawfulness of government function(s) at issue and whether they agree with the laws authorizing them.

This ruling would prevent the defendants from delving into areas that are irrelevant to the case at hand—such as the perceived legality, propriety, or wisdom of the CDC COVID-19 vaccination program. This issue is also necessary to resolve in order to decide on the appropriate Jury Instruction for the elements of Count 1 regarding the alleged Conspiracy to Defraud the United States by impeding, impairing, obstructing, or defeating the HHS and CDC's lawful government function(s) of administering and distributing COVID-19 vaccines and vaccination record cards in a manner that would provide a reliable means of verifying vaccination status.

The court's ruling on this motion in limine will be important because it may significantly narrow the scope of the issues for trial and prevent the introduction of unfairly prejudicial material. To prepare their witnesses for trial, the parties will need to understand the scope of any order precluding the introduction of such evidence or argument.

### 6.3    The United States' Pending Motion in Limine No. 3: To preclude defendants from indirectly raising a necessity defense or any variants thereof (ECF 273).

This motion in limine seeks to preclude the defendants from indirectly raising an already precluded necessity defense or any variants thereof. Again, this matter was already heavily litigated and ruled on by this Court. The Court specifically ruled that the defendants were precluded

---

[18]  ECF 270 [MIL No. 2] Ex. 1 [10.18.24 Hr. Tr.] at 76:21-24).

from raising a necessity defense. Yet despite the Court's order, the defendants seem to be committed to try to indirectly raise such a defense. They have suggested that they intend to try to introduce concerns about vaccine efficacy and potential side effects, CDC policies during the pandemic, and restrictions that unvaccinated persons faced during the pandemic.

As noted in the United States' motion in limine, the Court has already ruled and found as a matter of law that the defendants' quasi-necessity defense is invalid and precluded from this trial. Therefore, the defendants should not be permitted to suggest to the jury that they should consider whether Dr. Moore and his codefendants were acting to "save lives" or even to "save lifestyles" during the pandemic. The Court should redraw and reinforce a bright line on this issue.

This ruling would prevent the defendants from delving into areas that are irrelevant to the case at hand—such as the perceived legality, propriety, or wisdom of the CDC COVID-19 vaccination program and the defendants' and the card recipients' motivations for distributing or obtaining fraudulent vaccination record cards during the pandemic. No such issues are relevant.

The Court's ruling on this motion in limine will be important because it may significantly narrow the scope of the issues for trial and prevent the introduction of unfairly prejudicial material. To prepare their witnesses for trial, the parties will need to understand the scope of any order precluding the introduction of such evidence or argument.

### 6.4    The United States' Pending Motion to Seal Certain Exhibits and Testimony and Protect Certain Discovery (ECF 298).

The United States has a pending motion to seal Trial Exhibit 5 which comprises contract documents relating to the prices that the United States paid for COVID-19 vaccines. As noted above, the United States believes it will not need to use these documents to establish that the United States paid at least $1 per dose of each COVID-19 vaccine. Therefore, the United States my withdraw this trial exhibit. This may moot the motion to seal.

## 7.  OTHER ANTICIPATED LEGAL ISSUES

The United States anticipates some potential evidentiary issues for trial. These include:

1.    Whether the defendants will comply with the Court's rulings on the motions in limine precluding them from introducing certain evidence at trial.

2.    To what extent the parties can mention what the case is not about without opening the door to precluded testimony or evidence.

3.    Whether Gary Disbrow, Ph.D. will be permitted to testify to the specific costs of the COVID-19 vaccines at issue under seal.

4.    To what extent the defendants have waived their objections to the United States' trial exhibits.

### 7.1    Whether Defendants will comply with the Court's rulings on the motions in limine precluding them from introducing certain evidence at trial.

The United States has a concern that the defendants and other witnesses may not fully understand the implications and scope of the Court's rulings on motions in limine. Namely, the United States is concerned that if Dr. Moore, Ms. Andersen, or other defense witnesses were to take the stand, they may try to introduce precluded evidence. The United States is especially concerned that these witnesses might try to raise their motivations for committing the charged crimes and for providing fraudulent COVID-19 vaccination record cards to unvaccinated persons. The United States is likewise concerned that the defense might question government witnesses in a way that might inadvertently elicit precluded evidence related to the necessity defense or other prohibited evidence. This would be problematic.

Therefore, to avoid this potential issue, the United States requests that (1) at the final pretrial conference, the Court make clear to the defendants and to all counsel the scope of its in limine orders, (2) at trial, the Court allow questioning attorneys some leeway with leading questions where necessary to avoid eliciting prohibited testimony or evidence, and (3) at trial, the

Court periodically remind witnesses (outside the presence of the jury) before they take the stand about any limitations on the testimony that they can provide.

### 7.2    To what extent the parties can mention what the case is not about without opening the door to precluded testimony or evidence.

The United States believes that there are many things that this case is not about. For example, it is not about the wisdom, propriety, or legality of the CDC's COVID-19 vaccination program. It is not about vaccine efficacy or potential side effects from the vaccine. It is not about lockdowns, masking, or mandates during the pandemic. Nor is it about social distancing or what anyone in particular feels about Dr. Fauci or his performance during the pandemic.

However, the United States is concerned that if either side were to raise such issues—even in the context of what this case is not about—it could open the door to the admission of otherwise precluded evidence. Therefore, the United States requests some clarity about to what extent either side could mention at trial what the case is not about.

### 7.3    Whether Gary Disbrow, Ph.D. will be permitted to testify to the specific costs of the COVID-19 vaccines at issue under seal.

The parties have had some disputes as to whether Gary Disbrow, Ph.D. should be permitted to testify regarding the specific costs of the COVID-19 vaccines at issue under seal and as to whether he could rely on certain contract documentation to do so. To avoid this dispute, the United States believes that Dr. Disbrow can competently testify, without relying on these contract documents, that the United States paid at least $1 for each dose of the COVID vaccines at issue.[19]

/ / /

/ / /

---

[19] The United States also believes that Dr. Disbrow could testify at trial to the specific amounts that the United States paid per dose of each COVID vaccine without introducing the contract documents into evidence. But the United States believes that may not be necessary.

### 7.4    To what extent the defendants have waived their objections to the United States' trial exhibits

As noted above in Section 5.1.12, the United States believes that by failing to make timely objections by the deadlines set by the Court's Trial Order, the defendants have waived their rights to assert any objections to the United States' trial exhibits—other than objections under Rule 402 and 403. The United States asks the Court to rule on this issue at the final pretrial conference.

This ruling matters. For if the Court were to rule otherwise, then the United States would be subject to last-minute ambush by the defendants in relation to the admissibility of its trial exhibits. The Court's deadlines for exchanging trial exhibits and for formally making objections to opposing parties' trial exhibits well in advance of trial allows the parties to prepare for trial, with a fair understanding of whether any of their exhibits will be challenged at trial. Absent good cause and exceptional circumstances, the Court should not allow parties to reserve objections contrary to the Court's Trial Order. This would not be fair to the United States.

## 8.    ANTICIPATED DEFENSES

Based on the trial exhibits and witnesses that the defendants have identified, the United States anticipates that the defendants may assert the following defenses:

1. That the defendants did not conspire to defraud the United States by impairing, impeding, obstructing, or defeating a lawful government function of the HHS and CDC, but that they intended only to obstruct a Utah State immunization program;

2. That the COVID-19 vaccines and vaccination record cards at issue did not belong to the United States at the time of their conversion, or at least that the United States cannot prove beyond a reasonable doubt that they did belong to the United States then; and

3. That the United States cannot prove that Dr. Moore or his codefendants knew that they were violating the law when they acted as charged.

These potential defenses merit little response.

First, it is not believable that a highly educated plastic surgeon such as Dr. Moore would not understand, based on his medical training and experience, based on the CDC COVID-19 Vaccination Program Provider Agreement he signed, and based on the HHS and CDC logos on the vaccination record cards that he distributed, that the government function and vaccination program he was interfering with did not involve the HHS or CDC and the federal government.

Second, the United States' evidence will establish beyond a reasonable doubt that the COVID-19 vaccines and vaccination record cards belonged to the United States and that they could be obtained, administered, and distributed only by authorized providers who had enrolled in the CDC COVID-19 vaccination program and had agreed to abide by the CDC's rules and protocols for administering and distributing the vaccines and cards.

Third, as noted in the United States' briefing regarding its pending motions in limine and its proposed jury instructions, the United States need not prove that the defendants knew they were violating a known legal duty. Rather, the United States need only prove that the defendants knowingly conspired to defraud the United States, knowingly conspired to and did convert, sell, convey, and dispose of government property, and, in the case of Dr. Moore, that he knowingly destroyed evidence (or corruptly persuaded Ms. Burgoyne to do so).

For these and other reasons, the defendants' potential defenses should fail.

9. **CONCLUSION**

At trial, the United States will invite the jury to follow the facts and the evidence, to use their common sense, and to consider the defendants' actions in (1) secretly distributing fraudulent COVID-19 vaccination record cards to unvaccinated persons during the pandemic, (2) falsely reporting that they had actually vaccinated these persons, and then (3) destroying evidence of their

crimes by getting rid of unused vaccines after they were indicted. If the jury does so, the evidence will prove beyond a reasonable doubt that the defendants are guilty as charged.

The United States is prepared to address any of the issues raised herein. And the United States will be ready for trial.

RESPECTFULLY SUBMITTED,

Felice John Viti
Acting United States Attorney

*/s/ Todd C. Bouton*
TODD C. BOUTON

Assistant United States Attorney